UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-10089-CIV-KING/DUBÉ

EDWARD P. TORTOLANO,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Defendant (D.E. #14) and the Motion for Summary Judgment filed by the Plaintiff (D.E. #17) pursuant to an Order of Reference entered by the Honorable James Lawrence King, United States District Judge. The issue before this Court is whether the record contains substantial evidence to support the denial of benefits to Plaintiff Edward P. Tortolano (hereinafter "Tortolano" or "Plaintiff").

## I. FACTS

The Plaintiff, initially filed an application for disability insurance benefits on April 22, 2004. (R. 40-42).[1] The application was denied initially and on reconsideration. (R.30-38). An initial hearing was held on June 15, 2006. (R. 192-235). On September 27, 2006 a second hearing was held to include the testimony of a medical expert. (R. 175-191). Following the second hearing, the ALJ issued a decision denying the request for benefits. (R. 9-15). A request for review filed with the

---

1 All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

Appeals Council was denied. (R. 4-8).

First Hearing Testimony

The Plaintiff testified that he was 53 years old, had a twelfth grade education and a "two-year business course" at a trade school. (R. 196). Tortolano stated that his prior employment was as a master plumber contractor whose duties included installing, estimating, managing, plumbing, and heating in residential and high rises. (R. 196-197). Additionally, the Plaintiff stated that he owned his own plumbing, contracting business. However, since 1997 he has only been able to perform part-time plumbing work and he plays the piano as a hobby. (R. 197).

Tortolano testified that he had been playing piano since the age of eight and was "classically trained." The Plaintiff stated that he has been unable to work on a full-time basis because he tires after 2-3 hours of manual labor and his right side swells up and becomes stiff after an hour's work. (R. 197). The Plaintiff added that he has problems walking and "trouble turning or using any part of my left, my right hand or right leg." (R. 197-198).

The Plaintiff stated that he started noticing his symptomology sometime in 1998 or 1999 when he had a "lack of dexterity in his hand." Tortolano also stated that he wasn't able to walk further than 100 yards without his legs swelling up and that his right foot would drag. (R. 198). The Plaintiff testified that he becomes tired all the time and needs rest between small chores. Tortolano explained that initially he thought he was having problems with the cervical area. (R. 199).

The Plaintiff was previously on medications which he stated caused constant nausea and fatigue. Tortolano testified that he would fall asleep anywhere and couldn't drive at all. (R. 200). The Plaintiff has not taken his medications for two years because of the side-affects. (R. 201). The Plaintiff testified that his daily symptoms included: lack of use of his right side; trouble dressing,

combing his hair, using the bathroom, showering and tying his shoes; and swelling in the right side of his body after 2-3 hours of being awake. (R. 202). The Plaintiff explained that the swelling occurs in his hands and feet. (R. 202-203). The Plaintiff stated that the swelling occurs even when he is sitting down and to relieve the swelling he must elevate his legs for 20-30 minutes. (R. 203-204).

Tortolano testified that he wakes up at 10:00 a.m., makes a pot of coffee, gets the newspaper, feeds the dog, then needs to sit down. Additionally, he takes a shower and goes in the backyard to "putz around in the garden a little bit." (R. 204). The Plaintiff stated that he rests between 2-3:00 p.m. and then gets something to eat at 4:00 p.m. Tortolano said that his wife handles most of the shopping, cooking and cleaning, but that he tries to help. The Plaintiff goes to sleep between 12-1:00 a.m. and usually sleeps through the night. (R. 205).

The Plaintiff testified that since around 1999-2000 he learned how to play the piano with one hand. The Plaintiff stated that in 2001 he noticed signs of a decline in his abilities as he could not manipulate wrenches, play the piano and became tired for no reason. (R. 206). Tortolano said that it was not until he was sent to a vocational rehabilitation center that he discovered that he has Parkinson's disease. (R. 207). The Plaintiff stated that he typically needs to rest six hours in a twelve hour day. Tortolano added that he is unable to pick up a dime off the floor or tie his own shoes. (R. 208).

In addition to the Plaintiff's testimony, the Plaintiff's wife, Kathy Tortolano testified at the hearing. Ms. Tortolano stated that she and her husband had been married for four and a half years and had been together since 1998. (R. 209-210). The Plaintiff's wife testified that since 2001, the Plaintiff has not been able to drive and cannot walk more than two blocks. (R. 210). According to Ms. Tortolano, initially they thought that the Plaintiff had a pinched nerve. (R. 211).

Pedro Roman, a vocational expert also testified at the June 15, 2006 hearing. (R. 212). The vocational expert described the Plaintiff's past relevant employment as a plumber as DOT number 862.381-030 which is classified as heavy with an SVP of 7. However, the VE increased the SVP to an 8 or 9 because the Plaintiff owned his owed business. (R. 214). The ALJ posed a hypothetical question to the VE which included the following restrictions: a person with the same education as the Plaintiff, under 50 years of age, light with occasional overhead reaching, pushing, pulling, and gross handling with the non-dominant hand and no foot pedals. (R. 213).

The VE responded that such a person would not be able to perform the Plaintiff's past relevant work, but would be capable of performing work as an estimator, DOT number 169.267-038, classified as sedentary with an SVP of 7, but added that estimating at a job site would be classified as light. He added that such a person would also be able to perform work as a gate guard, DOT number 372.667-030, classified as light with an SVP of 3; automobile service station attendant, DOT number 915.467-010, classified as light with an SVP of 3; and as a courier, DOT number 230.663-010, classified as light with an SVP of 2. (R. 215).

The ALJ then posed a second hypothetical which included the following limitations: two hours standing/walking; six hour of sitting; no overhead reaching, pushing, pulling, gross handling or fine fingering with the non-dominant hand; and no foot pedals. (R. 216-217). The VE responded that the Social Security Regulations require the use of both hands for most sedentary level jobs so there would be no jobs that could be performed in the local or national economy. (R. 217).

The Plaintiff's attorney then asked the VE whether the Plaintiff would be able to work if he required the ability to rest frequently without restrictions; to which the VE opined there would be no jobs which the Plaintiff could perform in the local or national economy. (R. 217).

4

Second Hearing Testimony

A second hearing was held on September 27, 2006 wherein Oscar Formati, a medical expert was the first to testify. (R. 175, 180). Dr. Formati testified that based on his review of the record, the Plaintiff has idiopathic Parkinson's syndrome and that it probably started before 2001, "but to what degree and when, we do not know." (R. 180-181). Dr. Formati added that it is impossible to determine whether it started earlier than 2001, but it is a very high probability because "this is a very slowly progressive neurodegenerative disease and sometimes the signs are so light, so superfluous that we cannot distinguish. So it's probably, in my opinion, the date is correct maybe, 2001." He added however, that he could not say the Plaintiff met or equaled a listing in 2001. (R. 181).

Dr. Formati testified that workplace limitations for Parkinson's disease is to avoid extreme temperature changes, heights, scaffolding, climbing ladders, any hazardous occupation mainly involving heights and machinery. (R. 182).

The Plaintiff's attorney then asked the medical expert the following:

> .... My specific question is, Dr. Kaplitz gave certain limitations as of the date of her first visit, including the inability to perform a 40-hour work, sit-down job. My question to you is, was it reasonable for that doctor to project that, knowing the nature of the disease and it's progression from way back from 1997, that those limitations that she found in July 2002 would reasonably existed on December 31, 2001, which was approximately six months before the date of her –

(R. 184-185). To which Dr. Formati responded, "it's reasonable." (R. 185).

Nicholas Fidanza, a vocational expert also testified at the hearing. (R. 187). The ALJ posed the following hypothetical question to the VE: an individual with the same age, education and past work experience as the Plaintiff at the light exertional level, with no concentrated exposure to extremes of temperature, no working with scaffolds, ladders or unprotected heights, no ropes, and

5

no rope climbing. (R. 187-188). The VE opined that the Plaintiff would not be able to return to his past relevant work. However, the VE stated that an entry-level light work with the aforementioned limitations, he would be able to perform injection molding tender, DOT number 556.685-038, classified as light with an SVP of 2; and an electronics worker, DOT number 726.687-010, classified as light with an SVP of 2. (R. 188).

In response to a question from the Plaintiff's attorney, the VE stated that a person who could not perform work for more than 1-2 hours per day would not be able to perform work at step 5 in accordance with Social Security Ruling 96-8 (p) as he would not be able to work 8 hours a day or 5 days a week. (R. 189).

In addition to the testimony, the ALJ also reviewed the Plaintiff's medical records. On June 3, 2002, the Plaintiff was seen by Dr. Jeanette Straga and Dr. Nancy J. Kaplitz with complaints of right-sided weakness, numbness, swelling and cramping over the previous two years with a specific decline in the use of the right side in the previous six months. (R. 99). Physical examination revealed supple neck, good range of motion, spine is unremarkable and extremities without clubbing, cyanosis or edema. (R. 100).

Neurological testing showed, muscle strength 5/5 throughout with normal tone, however, slightly increased tone in the right upper extremity was noted; shoulder shrug decreased on the right side; deep tendon reflexes were found to be symmetric, 2/4 in the upper and lower extremities; 2/4 at the knees; and 1/4 at the ankles. The doctors' impression was right sided, progressive weakness and pain, suspect upper neuron lesion. She ordered and MRI of the head and neck along with an EMG/NCV for the right upper extremity. (R. 100).

An MRI taken of the cervical spine on June 7, 2002, revealed no abnormalities of the

visualized hindbrain or cervical cord. There is the degenerative disc disease at C5-6 with interspace narrowing and type II degenerative endplate change. Mild posterior osteophytic ridging at that level and there is minimal posterior bulge at C3-3, neither of which appeared to be clinically significant. (R. 101). An MRI of the brain taken on the same day revealed no abnormalities. (R. 102).

The Plaintiff returned to Dr. Straga for a follow-up visit on June 13, 2002. The Plaintiff reported more weakness as well as cramping of the right upper extremity. Examination revealed, muscle strength 5/5; deep tendon reflexes 2/4, the right biceps and brachioradials was 1/4; lower extremities were 2/4 except the right ankle jerk, 1/4. After physical and neurological examinations, Dr. Straga's impression was progressive right upper extremity weakness, questionable symptoms in the right lower extremity. (R. 98).

On August 2, 2002, the Plaintiff returned to Dr. Kaplitz for another follow-up visit. The results of the EMG/NCV of the right upper and lower extremity were normal. Physical examination revealed slight masking of the right side of the face; "<u>tone shows mild cogwheel rigidity in the upper extremities, slightly more on the right</u>;" gait was notably decreased to absent right arm swing; the Plaintiff held his arm slightly flexed at the elbow with his MCP joints also somewhat flexed; slight dragging of the right foot; and speech and language were normal. Dr. Kaplitz found a working diagnosis of Parkinson's disease and prescribed the Plaintiff Amantadine. (R. 97).

On January 6, 2003, the Plaintiff returned to Dr. Kaplitz for a follow-up visit. Dr. Kaplitz reported that Dr. Lieberman at the Miami Movement Disorder Center, confirmed his previous diagnosis of Parkinson's disease and placed the Plaintiff on Requip. The Plaintiff reported being tired, but not excessive, and also that there was no symptomatic improvement with the medication. Tortolano was put on a medication program and told to return in 6-8 weeks. (R. 122).

During a July 10, 2003 follow-up visit with Dr. Kaplitz, the Plaintiff reported no significant response to Requip and stopped taking the medication due to nausea and fatigue. The Plaintiff had good range of motion and no tenderness in the right shoulder. Physical therapy was recommended. (R. 127).

On March 19, 2004, Dr. Kaplitz noted that the Plaintiff's Parkinson's disease had continued to progress. The right upper extremity was "quite stiff" and the Plaintiff reported that his right hand was basically useless. The Plaintiff reported swelling in the right upper extremity and an occasional tremor in the right leg. His gait was "slower." (R. 118). She recommended placing him on Sinemet and opined that the Plaintiff was disabled as a result of the Parkinson's disease. (R. 119).

During a May 27, 2004 follow-up visit, the Plaintiff reported that he had not take the Sinemet as he was concerned about potential side effects. The doctor noted that he previously had side effects when taking Requip. After physical examination, Dr. Kaplitz again recommended that the Plaintiff take Sinemet and Skelaxin for the right upper extremity pain. She stated that the Plaintiff is unable to work effectively. (R. 114).

On July 1, 2004, the Plaintiff's attorney took a sworn statement of Dr. Kaplitz. (R. 134-143). Dr. Kaplitz stated that she had seen the Plaintiff a total of ten times between July 12, 2002 through May 27, 2004. (R. 136). Dr. Kaplitz stated that her diagnosis of the Plaintiff was Parkinson's disease which she explained is a clinical diagnosis by history and examination. (R. 136-140). She reported that her examinations revealed problems with the right side of the Plaintiff's body, rigidity and stiffness, some weakness, difficulty holding objects and difficulty walking. She added that these problems existed approximately for six months before his initial visit. (R. 137). She stated that his symptoms are consistent with her own objective and clinical findings, and she never felt that the

Plaintiff was exaggerating his symptoms. (R. 138). After being read the Social Security Administration's definition of light work, Dr. Kaplitz stated that she did not feel that the Plaintiff would be able to perform that level of work on a sustained basis during the course of treatment. (R. 140). Dr. Kaplitz opined that the Plaintiff would require frequent rest, could only stand 1-2 hours per day and could only lift occasionally between 5-10 pounds. (R. 141). She added that these limitations would have existed prior to December 31, 2001. (R. 142).

On August 27, 2004, a Physical Residual Functional Capacity Assessment form was completed. (R. 144-151). The assessment reported that the Plaintiff could occasionally lift/carry up to 50 pounds and frequently lift/carry up 25 pounds. (R. 145). It stated that the Plaintiff could stand and/or walk and sit for at least 6 hours in an 8 hour workday; and is not limited in pushing and/or pulling. (R. 145). Further, the report stated that the Plaintiff had no postural, manipulative, visual, communicative or environmental limitations. (R. 146-148).

A second Physical Residual Functional Capacity Assessment was completed on October 13, 2004 which gave the same findings as the previous assessment with the exceptions of occasionally lifting/carrying 20 pounds and frequently lifting/carrying 10 pounds. (R. 152-159).

After a hearing and review of the record, the ALJ issued an opinion finding that through the date of last insured, the claimant had the residual functional capacity to perform light work not requiring climbing of ropes, ladders, or scaffolds, exposure to unprotected heights, or concentrated exposure to temperature extremes. The ALJ then found that while the Plaintiff could not return to his past relevant work, there were other jobs which he could perform in the national economy as of December 21, 2001, and thus, the Plaintiff was not "disabled." (R. 15).

## II. LEGAL ANALYSIS

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Kelley v. Apfel, 185 F.3d 1211, 1213 (11th Cir. 1999); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. Foote v. Chater, 67 F.3d 1553 (11th Cir. 1995); Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988). The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. See, Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987). The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. See, Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Baker v. Sullivan, 880 F.2d 319 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact. No presumption of validity attaches to the conclusions of law found by the Commissioner, including the determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient

reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that he is unable to perform previous work.

See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

In the present case, the Plaintiff's first point of contention is that the ALJ's reasons for rejecting the retrospective testimony of Dr. Kaplitz, the Plaintiff's treating physician, is not supported by substantial evidence. Additionally, the Plaintiff contends that the ALJ's credibility finding is not based on substantial evidence; and that the ALJ failed to sustain his burden of proof establishing that there is other work in the national economy that the Plaintiff can perform.

The opinion of a treating physician is entitled to substantial weight unless good cause exists for not heeding the treating physician's diagnosis. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been seen when the treating doctor's opinion was not bolstered by the evidence; the evidence supported a contrary finding or the opinion was conclusory or inconsistent with the physician's own medical records. If the ALJ disregards the opinion of a treating physician, the ALJ must clearly articulate his reasons. See Phillips v. Barnhart, 357 F.3d 1232, 1240-1241 (11th Cir. 2004).

In his decision, the ALJ recounted the record and opinion from Dr. Kaplitz, and stated as follows:

> In August 2002 the claimant was first examined by neurologist Nancy J. Kaplitz, M.D., who noted mild cogwheel rigidity in the upper extremities, sightly more on the right, decreased to absent arm swing on the right only, slower right upper and lower extremity fine motor movements, possible slight dragging of the right foot, and possible very slight masking of the right side of the face. Other clinical findings were unremarkable, including intact extraocular movements, cranial nerves, muscle strength, and reflexes, as well as normal speech and language. Dr. Kaplitz reported a working diagnosis of mild early

> Parkinson's disease and recommended further evaluation. A chest x-ray performed in December 2002 was normal (Exhibits 1F and 2F).

(R.12). The ALJ continued to summarize the Plaintiff's treatment history with Dr. Kaplitz, including her sworn testimony, and offered the following summation:

> In summary, the substantial evidence of record, as described above, fails to include any reports of medical examinations or treatment for the alleged symptoms on or before December 31, 2001. When first seen in June 2002 by Dr. Straga, only mild clinical abnormalities of uncertain origin were elicited. MRI findings showed cervical spine changes considered not significant and no brain abnormalities. The July electrodiagnostic studies were also interpreted as normal, and in August of that year Dr. Kaplitz was able to make only a working diagnosis of mild early Parkinson's disease. While in March 2004 Dr. Kaplitz noted some evidence of progression of the Parkinson's disease and stated for the first time that she considered the claimant disabled, her subsequent statement in July 2004 that the claimant had disabling limitations since December 31, 2001 is at best speculative and is considered unsupported by the available clinical findings and by Dr. Kaplitz's own evaluations during 2002.

(R. 13-14). Based on the above, and after rejecting the Plaintiff's subjective complaints, the ALJ turned to the assessment of the reviewing State Agency Medical Consultant Assessments and the testimony of the medical expert Dr. Formati. The ALJ concluded that the Plaintiff retained the residual functional capacity to perform other work in the national economy as of the Plaintiff's date of last insured (December 31, 2001). (R. 14).

In sum, the ALJ reached his conclusion by determining that the opinions of the examining physicians were inconsistent with the medical records and treatment notes, the Plaintiff's testimony and the findings of the Plaintiff's other treating physicians and consultative doctors. If the Commissioner's decision is supported by substantial evidence we must affirm, even if proof preponderates against it. Miles v. Chater, 84 F. 3d 1397, 1400 (11th Cir. 1996).

This Court cannot agree with the reasoning set forth by the ALJ. Medical evidence from as early as August of 2002 revealed, gait was notably decreased to absent right arm swing; the Plaintiff held his arm slightly flexed at the elbow with his MCP joints also somewhat flexed; slight dragging of the right foot, which are all signs of Parkinson's disease. (R. 97). This symptomology remained consistent throughout the Plaintiff's course of treatment as was outlined above. Further, Dr. Lieberman at the Miami Movement Disorder Center confirmed the diagnosis reached by Dr. Kaplitz that the Plaintiff did in fact have Parkinson's disease.

Contrary to the ALJ's assertion that the medical expert supported the position that the medical evidence failed to establish an impairment as of December 31, 2001; Dr. Formati actually testified that there was a great probability that onset of the Plaintiff's Parkinson's disease was in the early part of 2001 and that he found Dr. Kaplitz's testimony to be reasonable. When both vocational experts were given hypothetical questions consisting of the limitations set forth in the sworn testimony given by Dr. Kaplitz, both opined that there would be no work that the Plaintiff could perform.

It is the opinion of this Court that the ALJ's rejection of the medical opinion given by the Plaintiff's treating physician was not supported by substantial evidence. Further, had the medical opinion of the Plaintiff's treating physician been given substantial weight, this Court finds that the Plaintiff would have been found disabled within the meaning of the Social Security Act. It is the opinion of this Court that the case should be remanded and an award of benefits should be awarded to the Plaintiff. Accordingly, it is the recommendation of this Court that the decision of the ALJ be reversed as his decision is not based on the substantial weight of the evidence. The Plaintiff's last two issues which were raised are made moot as a result of the Court's finding above.

## III. CONCLUSION AND RECOMMENDATION

Based on the foregoing, the Court finds that the decision by the ALJ is not supported by substantial evidence and the correct legal standards were not applied. Accordingly, it is the recommendation of this Court that the Motion for Summary Judgment filed by the Defendant (D.E. #14) be **DENIED**, the Motion for Summary Judgment filed by the Plaintiff (D.E. #17) be **GRANTED** and the decision of the Commissioner be **REVERSED** and this cause **REMANDED** and an award of benefits be entered in favor of the Plaintiff as is consistent with this Report and Recommendation.

Pursuant to Local Magistrate Rule 4(b), the parties have ten (10) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable James Lawrence King, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this ___13th___ day of August, 2008.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE